ATTORNEY OR PARTY WITHOUT ATTORNEY
Nancy Louise Horne (Pro Se)
555 Jackson Meadows Rd #94
Kila, MT 59920
Tel: 406-212-0267
Attorney for: Plaintiff (Pro Se)

FILED

CLERK, U.S. DISTRICT COURT

2/11/2026

CENTRAL DISTRICT OF CALIFORNIA

BY_____GSA_____DEPUTY

DOCUMENT SUBMITTED THROUGH THE
ELECTRONIC DOCUMENT SUBMISSION SYSTEM

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

NANCY LOUISE HORNE,

    Plaintiff,

    v.

STATE FARM MUTUAL

AUTOMOBILE INSURANCE

COMPANY,

    Defendant.

Case No.: 2:25-cv-10442

SECOND AMENDED COMPLAINT

Filed pursuant to the Court's Order granting leave to amend

JURY TRIAL DEMANDED

Plaintiff Nancy Louise Horne ("Plaintiff") alleges:

**I. INTRODUCTION**

1. Plaintiff is a Montana resident who, since 2010, paid premiums to Defendant State Farm Mutual Automobile Insurance Company ("State Farm") for automobile insurance, including $250,000/$500,000 bodily injury liability coverage and $50,000/$100,000 uninsured/underinsured motorist ("UM/UIM") coverage.

2. On July 27, 2019, in Los Angeles County, California, Plaintiff was violently rear-ended while in a turn lane on Sunland Boulevard, suffering traumatic brain injury ("TBI"), upper-cervical and lumbar spine injuries, and related sequelae. (Ex. A.)

3. State Farm handled Plaintiff's claim under its internal "Cluster-3" process, involving multiple insureds and conflicts of interest. Throughout the claim, State Farm maintained a 50/50 liability allocation based on a shifting and disputed narrative of the accident, despite internal information showing the other driver, Joshua Walker, was primarily or wholly at fault. (Ex. D.) (Ex. M-CSI (CSI 000143; CSI 000521; CSI 000820; CSI 000860).)

4. For years, State Farm delayed, under-investigated and failed to authorize appropriate diagnostic testing or fully and promptly pay available medical and UM/UIM benefits. Plaintiff was forced to fund significant diagnostic work and treatment out-of-pocket, including a later SPECT scan and upper-cervical evaluation including ongoing treatment that objectively confirmed longstanding TBI and spinal injury. (Ex. B.)

5. After years of litigation chaos and multiple attorney withdrawals, Plaintiff ultimately signed, on or about August 19, 2024, a Release in exchange for a "global" policy-limits settlement of $150,000 (including the tortfeasor's policy and Plaintiff's UM/UIM). That Release was presented after checks had already

been received and deposited, without meaningful negotiation or explanation, and under pressure of attorney liens and the threat of having no representation or recovery at all. (Ex. R.) (Ex. E.)

6. Plaintiff brings this action to (a) rescind or avoid the on or about August 19, 2024 Release based on fraud, concealment, and related misconduct; (b) recover actual damages and other relief available under Montana's Unfair Trade Practices Act and for breach of contract; and (c) obtain such further relief as permitted by law to enforce Plaintiff's rights under the policy and Montana law.

## II. PARTIES, JURISDICTION, AND VENUE

7. Plaintiff is a person residing in Kila, Montana. She was the driver and injured party in the July 27, 2019 collision.

8. Defendant State Farm Mutual Automobile Insurance Company is an Illinois corporation licensed to issue and administer automobile insurance in Montana and California, doing business in Los Angeles County at all relevant times.

9. State Farm issued automobile insurance policies to Plaintiff in Montana, including the policy in effect on July 27, 2019, which provided bodily injury liability coverage and UM/UIM coverage, among other coverages. State Farm also insured the adverse driver and vehicle owner involved in the collision.

10. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 based on

diversity of citizenship and an amount in controversy exceeding $75,000.

11. Venue is proper in this District because the underlying collision occurred in Los Angeles County and State Farm conducted substantial claim-handling activities in this District.

12. Governing Law. Plaintiff's automobile insurance policy was issued and delivered in Montana to a Montana resident for a Montana insured vehicle and risk. The policy is a Montana contract and contains a Montana choice-of-law provision. Plaintiff's claims arise from Defendant's performance and non-performance under that Montana policy, including the handling of UM/UIM and Medical Payments benefits and related communications. Plaintiff therefore alleges that Montana substantive law governs the interpretation of the policy and the claims asserted in this Second Amended Complaint, including Plaintiff's common-law claims (fraud and breach of contract) and Plaintiff's statutory claim under Mont. Code Ann. §§ 33-18-201 and 33-18-242. Plaintiff asserts these claims as an insured/first-party claimant under a Montana policy and does not assert a third-party statutory bad-faith claim under California law. Plaintiff pleads in the alternative only to the extent the Court determines that another state's law applies to any claim.

13. Policy Choice-of-Law Provision. Defendant has taken the position that the policy's choice-of-law provision requires application of Montana substantive

law. Plaintiff alleges Montana law applies for the reasons stated above and reserves the right to quote and attach the specific policy provision as appropriate after full production of the policy and claim file in discovery.

## III. FACTUAL ALLEGATIONS

### A. The Collision and Initial Injuries

14. On July 27, 2019, at approximately 6:10 a.m., Plaintiff was driving a rental vehicle in a turn lane on Sunland Boulevard near Fenwick Street in Los Angeles County. While preparing to turn, she was struck from behind at high speed by a vehicle driven by Joshua Walker. The impact was severe and caused substantial rear-end damage. (Ex. A.)

15. Immediately after the collision, Plaintiff experienced head, neck, and back pain, cognitive problems, visual issues, and other symptoms consistent with TBI and whiplash-related upper-cervical injury. Over time, these symptoms worsened, contributing to chronic pain, cognitive fatigue, and inability to work and maintain her prior life activities.

### B. Coverage, "Cluster-3" Assignment, and State Farm's Roles

16. Plaintiff maintained State Farm auto policies providing $250,000/$500,000 bodily injury liability limits and $50,000/$100,000 UM/UIM limits, as reflected in policy declarations and underwriting materials. (Exs. M-1-M-3.)

17. State Farm assigned the claim to its internal "Cluster-3" process, reflecting

multiple insureds and potential conflicts. State Farm adjusters and defense counsel handled both Plaintiff's claims and the defense of the adverse driver and vehicle owner, creating inherent tension between State Farm's duties to its different insureds. (Ex. M-CSI (CSI 000143).)

18. On the same date, State Farm (Yang) sent counsel two separate letters on two different claim numbers—one identifying Plaintiff as "Our Insured" and another identifying the adverse insured/vehicle owner as "Our Insured"—reflecting State Farm's handling of multiple insured interests arising out of the same loss. (Ex. M-CSI (CSI 000259; CSI 000753).)

19. Early claim notes and communications reflect State Farm's awareness that the striking driver was likely at fault, yet the claim handling continually recorded a 50/50 liability allocation, which adversely affected Plaintiff's claim valuation and coverage decisions. (Ex. M-CSI (CSI 000392; CSI 000393; CSI 000820; CSI 000860; CSI 000891).) (Ex. M-1-M-3.)

20. On February 12–13, 2023, Plaintiff emailed Sandy Goode-Long (State Farm agent/representative) asking why she "may be stuck with only a $50,000 policy when [she had] been paying for $250,000," explaining that her prior law firm "quit 9-28-2022" and that she was going to court on February 16, 2023 to obtain release(relief) from prior counsel. The agent forwarded Plaintiff's email to Peter Yang (Claim Specialist – Injury / Cluster-3 handler). (Ex. I.)

21. In the course of defending its insured Joshua Walker, State Farm retained counsel who prepared a claim evaluation report summarizing liability and injury contentions and presenting a narrative supporting a disputed posture. Plaintiff alleges State Farm relied on and/or allowed this defense posture to coexist with its first-party duties, contributing to prolonged delay and undervaluation of Plaintiff's claim. (Ex. M-CSI (CSI 000238).) (Exs. M-1–M-3.)

22. Montana's Office of the Commissioner of Securities and Insurance ("CSI"), in a later market conduct examination of State Farm, documented claim-handling issues including comparative-fault allocations and underpayments. Plaintiff's CSI investigative file (approximately 977 pages) contains internal State Farm communications and Auto File History – File Notes entries relevant to liability and claim valuation in her case. Plaintiff attaches limited Auto History excerpts produced through CSI as Exhibit M-1, M-2, M-3. (Ex. M-1–M-3.) Reassignment / lack of consistent ownership. State Farm's Auto History entries reflect repeated reassignment and consolidated handling "under reference claim," indicating that handling moved between files/handlers rather than remaining under a single consistent owner to resolution. (Ex. M-1.)

   a. Delay loops and status-tracking. The Auto History reflects repeated status requests and follow-ups over time, including requests for updates regarding whether UIM would be pursued and the status of treatment and the

underlying suit, reflecting ongoing administrative tracking rather than prompt resolution. (Ex. M-1.)

b. Cross-jurisdiction context (Montana policy / California loss). The Auto History reflects a Montana policy with a Los Angeles/California loss context ("MT policy / CA loss"), supporting Plaintiff's allegation that the claim was handled through a cross-jurisdiction framework that contributed to confusion, misrouting, and inconsistent execution of claim-handling steps. (Ex. M-1; Ex. M-2.)

c. Medical management not conducted. The claim notes include an entry stating that "no medical management was conducted," supporting Plaintiff's allegation that injury evaluation and care coordination were not meaningfully integrated into the claim process. (Ex. M-1.)

d. Liability posture inconsistency reflected in the file. The Auto History for the related bodily injury handling narrative reflects a 50/50 fault allocation, supporting Plaintiff's allegation that comparative-fault positioning was recorded in a manner that adversely affected claim valuation and coverage decisions. (Ex. M-3.)

e. Early 50/50 "established" while investigation/coverage steps were still pending. State Farm's Auto History reflects that liability was "established at 50/50" based on stated assumptions such as the "lack of any independent eyewitness," while contemporaneous entries reflect unresolved investigation/coverage steps relating to the rental vehicle (including determining primary coverage and tendering to the rental agency). (Ex. M-2.) (Ex. M-CSI (CSI 000854.)

f. Internal file note reflecting improper basis for shifting liability posture. On February 23, 2023, State Farm injury claims supervisor Elena Jones recorded that the file handler stated he had "initially finalized 100% against

Horne," but "changed his decision to 50/50" because both the named insured and claimant were insured by State Farm; Jones recorded that this rationale "isn't how liability works." (Ex. M-1.) (Ex. M-CSI (CSI 000835.)

g.  Internal re-review reflects a different liability conclusion. In contrast to the 50/50 posture reflected elsewhere, State Farm's internal re-review notes reflect a 100%/0% liability conclusion in Plaintiff's favor in the UIM context (100% against V2 and 0% against State Farm's insured). (Ex. M-2.)

h.  Administrative and payment/record errors. The Auto History reflects claim administration and payment/record handling steps requiring correction (including correction of a payment record to show the proper payor), supporting Plaintiff's allegation of file-management errors and administrative friction. (Ex. M-3.)

i.  Relevance to harm and damages alleged below. Plaintiff alleges that prolonged administrative handling reflected in these entries, together with inconsistent liability posture and lack of integrated injury evaluation, contributed to delayed diagnosis and care, increased out-of-pocket medical/diagnostic/travel costs, and loss of earning capacity, as further alleged below in the damages section. (See Section I; Ex. M-1–M-3.)

**C. Liability Misallocation, Changing Stories and Failure to Preserve Evidence**

23. August 2019, State Farm Claim Specialist-Injury Peter Yang recorded a 50/50 fault allocation, based in part on a description that Plaintiff allegedly made an unsafe right turn from a parking lot and failed to yield to a vehicle already "established" on the major street.

24. Later, defense counsel and claims communications reveal that the adverse

driver changed his story, asserting that Plaintiff allegedly made a U-turn in front of him and then suddenly stopped. These explanations materially differ and highlight that the liability narrative shifted over time.

25. Despite conflicting stories and significant rear-end damage, State Farm failed to timely obtain or preserve critical liability evidence, including event-data recorder (EDR) information, rental-vehicle telematics, surveillance video, and thorough accident reconstruction, even when such investigation was requested or discussed.

26. At the scene, an unidentified woman who appeared to be associated with the adverse driver took photographs of the vehicles and scene for an extended period, including photographs directed toward Plaintiff's vehicle. (Ex. A-8. "Scene photo showing unidentified woman photographing vehicles (IMG_1833).) In discovery, the adverse driver—represented by State Farm-retained counsel—responded that he "does not possess any photographs of the scene of the incident." Plaintiff has not been provided the photographs taken by this unidentified woman and is not aware of any meaningful effort by State Farm or its counsel to locate, preserve, or produce them, despite their obvious relevance to liability, collision severity, and credibility.

27. Plaintiff herself took multiple photographs of the damaged vehicles and scene immediately after the collision, including the severe crush damage to the

striking vehicle and the square rear-end impact to her car. (Ex. A.)

28. On August 12, 2019, State Farm Claim Specialist-Injury Peter Yang responded to Plaintiff and cited a liability theory based on California Vehicle Code § 21804, while directing Plaintiff to make "a specific request" for any documents she sought, reinforcing State Farm's early liability posture and control over evidence access. (Ex. M-CSI (CSI 000816; CSI 000753).)

29. In the same correspondence, State Farm refused to provide information about the "Grilled Cheese Truck" vehicle and directed Plaintiff to obtain information elsewhere (including from the adverse driver or LAPD), despite the obvious relevance of such information to the collision facts and liability evaluation. (Ex. M-CSI (CSI 000817).)

30. On March 3, 2020, State Farm stated it was 'unable to disclose' the rental vehicle's estimate and photographs because Plaintiff was not the owner, preventing Plaintiff and counsel from reviewing collision-severity evidence. (Ex. M-CSI (CSI 000259).)

Plaintiff alleges State Farm possessed the estimate and photographs internally. Plaintiff further alleges the CSI investigative file includes the rental-vehicle estimate and related photographs, which Plaintiff will produce through discovery and, if appropriate, present to the Court in accordance with applicable rules and procedures. On March 1, 2023, State Farm Claim

Specialist–Injury Peter Yang emailed defense counsel confirming that State Farm "will not accept the liability and will not put it in writing," and instructing counsel to "please let clmt atty know." (Ex. M-CSI (CSI 000194).)

**D. Delayed Diagnosis, Denied Diagnostics, and Out-of-Pocket Medical Costs**

31. Between 2019 and 2023, Plaintiff underwent four conventional MRIs and evaluations (brain, cervical, lumbar), but did not receive advanced functional imaging or focused upper-cervical workup that would have revealed her TBI pattern and certain spine pathologies.

32. State Farm and/or counsel asserted conclusions minimizing Plaintiff's head injury and treatment history while acknowledging that key verification had not yet been performed. For example, a defense report stated that in a rear-impact collision Plaintiff was "not likely" to have struck her head and lost consciousness, and also stated that after an answer was filed it would subpoena medical records and bills and depose Plaintiff "to determine her credibility." (Ex. M-CSI (CSI 000310.) The same report inaccurately suggested Plaintiff had only limited treatment in April 2021, even though Plaintiff's providers' billing records reflect substantially more treatment (including approximately 80 visits at Apex and charges of $11,293.00). (Ex. P-5.) Plaintiff alleges these inconsistencies reflect failure to conduct a reasonable investigation based upon all available information and contributed to delay and undervaluation of

Plaintiff's first-party claim.

33. Plaintiff alleges that State Farm, through its claim-handling and med-pay/UM decisions, repeatedly denied, delayed, or failed to authorize advanced neuroimaging (such as Functional or DTI MRI or equivalent testing) and other diagnostics recommended or requested to evaluate her persistent symptoms. (Ex. F2)

34. As a result, Plaintiff was forced to pursue alternative care, including functional neurology, intensive physical therapy, chiropractic care, HBOT, and eventually a Brain SPECT scan at the Amen Clinic, largely at her own expense. (Ex. B.)

35. On or about September 6, 2024, after the settlement and Release, Plaintiff obtained a Brain SPECT scan and upper-cervical evaluation at Amen Clinic. These studies showed objective functional and structural abnormalities consistent with TBI, PTSD, insomnia, and upper-cervical syndrome, confirming that her long-standing complaints had an organic basis. (Ex. B.)

36. After years of being told that her symptoms were "age-related" or that "nothing more could be done," Plaintiff obtained specialized brain imaging and functional assessment at a brain injury clinic. The SPECT scan and clinical interpretation confirmed objective brain injury in regions consistent with Plaintiff's tracked symptoms, including reduced cognitive stamina, word-finding difficulty, sensory overload, emotional regulation impairment, and

visual strain.

37. A treating clinician identified severe upper-cervical dysfunction consistent with Plaintiff's history of a high-speed rear-end collision, reverse lordosis, and chronic head and neck pressure. Plaintiff was referred for upper-cervical chiropractic care. Comparative radiographs demonstrated C0–C2 misalignment and compensatory spinal changes. See Exs. B-1 (SPECT report), B-3 (Upper-Cervical Comparative Radiographic Report), and B-2/B-4–B-6 (receipts).

38. Plaintiff alleges these diagnostic findings and treatment response support that her injuries are concrete, structural, and neurologic, and that her long course of self-directed rehabilitation was necessary only because the claim-handling and professional failures left her without timely, appropriate evaluation. Plaintiff's allegations regarding systemic failures are based on Plaintiff's own treatment history and documented interactions with providers and insurers in this claim.

## E. Prior Counsel Abandonment and Litigation Chaos

39. In early 2020, after med-pay was depleted, State Farm's med-pay representative advised Plaintiff to hire an attorney. Plaintiff retained Ledger Law ("Firm 1"). Over time, multiple attorneys within Firm 1 rotated on and off her case, including Tate Casey, Brandon Carr and Brent Rawlings.

40. Plaintiff provided extensive documentation, pain-and-suffering forms, appointments, treatments, and financial information to Firm 1. Nonetheless,

Firm 1 failed to timely respond to defense correspondence, gave Plaintiff incomplete or incorrect information about offers, and did not close out the case when the tortfeasor's policy limits were eventually tendered. (Ex. F)

41. As part of the ordinary course of a litigated injury claim, Plaintiff understood that the parties would complete record subpoenas, obtain physician review, schedule defense medical examinations, and arrange plaintiff-side medical evaluations to assess the nature and extent of Plaintiff's injuries and functional limitations, followed by mediation before trial. Consistent with that ordinary process, on March 29, 2022—after Plaintiff's deposition and while trial remained set for December 15, 2022—Plaintiff asked prior counsel "What is the plan?" and counsel responded that defense medical exams were expected in the summer, that Plaintiff's counsel would also arrange examinations "for our side," and that mediation would likely occur in late summer/fall. (Ex. F2.) Despite that described plan, Plaintiff continued to deteriorate and did not receive timely, coordinated medical evaluation through the claim/litigation process. (Ex. B.) (Ex. P.)

42. On or about September 28, 2022, Plaintiff received a Substitution of Attorney form from Brent Rawlings, indicating that Firm 1 was withdrawing. At that time, trial in the underlying case had been set for December 15, 2022.

43. For approximately eight months, the court did not grant Firm 1's motion to be

relieved, leaving Plaintiff in limbo and effectively unrepresented during critical pre-trial periods. (Ex. F.)

44. During late 2022 and early 2023, Plaintiff repeatedly appeared at remote court hearings alone, while facing the possibility of a cross-complaint, unresolved liens, and unclear settlement status. She contacted approximately 38 law firms seeking new representation but was declined, in part because the available policy-limit money was already consumed and encumbered by attorney fees and costs.

**F. Settlement, Policy Limits, and Coverage Confusion**

45. Plaintiff retained Harker Injury Law ("Firm 2") in August 2023. Plaintiff expressly told Firm 2 that she wanted to be involved in and have a say in settlement negotiations. Firm 2 assured Plaintiff in writing that they always include clients in negotiations and would not accept or reject offers without her consent.

46. Firm 2 later acknowledged in writing that "there were no negotiations" in Plaintiff's case and that the total settlement of $150,000 represented "global" policy limits—i.e., the tortfeasor's liability policy plus Plaintiff's UM/UIM policy. Firm 2 further informed Plaintiff that the settlement checks had already been received and deposited, and that Plaintiff's role was to sign the Final Disbursal Sheet and Release. Plaintiff was not included in any substantive

negotiation with State Farm regarding the valuation of Plaintiff's claim, any consideration of future care, or any release terms. (Ex. E.)

47. Plaintiff executed a Release and Settlement of Claims on November 16, 2023, and later signed a Final Disbursal Sheet (Final Settlement Disbursement Statement) on August 19, 2024; settlement proceeds were disbursed/received on or about August 23, 2024. (Ex. R.)

48. Plaintiff believed for years that her $250,000/$500,000 bodily injury limits meant she had strong protection if seriously injured. Only late in the process did Firm 2 explain that those bodily injury limits applied only if Plaintiff was at fault and injured others, and that her own protection as an injured insured was limited to $50,000 UM/UIM.

49. In connection with Plaintiff's efforts to understand and maintain her coverage, Plaintiff received a written notice from State Farm regarding renewal of her automobile policy/policies. The notice advised Plaintiff to contact her agent if she wished to pursue eligibility for coverage going forward. Plaintiff understood the notice to mean her coverage could end unless she took prompt action through the agent. Given Plaintiff's traumatic brain injury and resulting cognitive limitations at the time, Plaintiff struggled to understand the practical implications of the notice and what coverage would remain available to protect her as the injured insured. (Ex. I.)

50. Plaintiff followed up with her State Farm agent/representative regarding the renewal/nonrenewal notice and her policy limits. In an email follow-up and recorded call 8-3-2021 Tanya Brower 4:30 pm transcript excerpt, the State Farm representative explained: "The liability … 250–500 … means that you've got $250,000 for the first person injured in an accident that's your fault … up to $500,000…," and further explained UM/UIM as "you're insuring your bodily injury against people who maybe don't have any or enough insurance that may hit you. OK so you're insuring yourself for $50–100,000." The representative did not clearly explain that the 250/500 limits described were third-party bodily injury liability limits and did not provide Plaintiff with equivalent protection for Plaintiff's own injuries in this collision, and did not clearly explain how Plaintiff's first-party recovery for her own injuries would be governed by separate coverages and limits (including UM/UIM and Med-Pay).

51. On or about February 13, 2023, Plaintiff emailed her State Farm agent/representative requesting a review and explanation of her coverages, specifically asking why she "may be stuck with only a $50,000 policy when [she had] been paying for $250,000," noting that the claim had covered only $5,000 in Med-Pay, and stating she was told to hire an attorney and then "NO ONE would talk to" her about coverage. (Ex. I.)

52. Even in mid-2024, as the case was closing, Plaintiff asked detailed written questions about the total settlement, how the $150,000 was calculated, how much came from the tortfeasor's policy versus her UM/UIM, how attorney fees and costs were applied, and whether future medical needs were considered. Firm 2 responded that the settlement represented all available policy limits and provided only a Final Disbursal Sheet, without a full narrative or clear explanation of how coverage decisions were made, how the liability posture affected settlement value, or how Plaintiff could protect future care needs. (Ex. E)

**G. Release Process, Exclusion from Negotiations, and Attorney Pressure**

53. Firm 1's fee/lien paperwork and proposed disbursement terms contributed to Plaintiff's perception that she could leave the matter owing money and without meaningful recovery, increasing pressure to sign the Release to obtain closure and avoid further financial harm. For example, Firm 1's March 21, 2023 'Preliminary Trust Accounting' reflected unresolved 'pending' items and stated that any additional liens or reimbursement claims not listed would be Plaintiff's responsibility and that Plaintiff would indemnify and hold the firm harmless regarding disbursement. (Ex. F.) ¶7

54. Plaintiff requested involvement in settlement negotiations. Firm 2 promised in writing to include her, but later admitted that there were no negotiations; policy

limits were simply accepted, and checks had already been deposited by the time Plaintiff was asked to sign the Release. (Ex. E.)

55. In June 2024, Plaintiff wrote to Firm 2 expressing she felt left out of the process, wanted documentation and dispersal details before finalization, and wanted clarity about Firm 1 and handling of policy-limit offers.

56. Firm 2 stated it would close the case "ASAP" once the final UM settlement check arrived, and that it considered itself obligated to honor Firm 1's attorney lien for approximately 40% of the $50,000 policy-limit offer Firm 1 had obtained, plus costs. Firm 2 indicated that any malpractice or abandonment issues involving Firm 1 were outside its practice and that Plaintiff would have to pursue such grievances separately.

57. Plaintiff faced the prospect that a large portion of the combined $150,000 settlement would be consumed by multiple sets of attorney fees, costs, and liens, leaving her with significantly less than her actual medical expenses, out-of-pocket costs, lost income, and future care needs. Given her TBI, chronic pain, financial collapse, and the difficulty securing new counsel, Plaintiff reasonably felt she had no choice but to sign the Release if she wished to receive closure or any net recovery at all. (Ex. R)

58. The contemporaneous record reflects that attorney fees and costs materially diminished Plaintiff's recovery and increased settlement pressure. For

example, on March 8, 2023, prior counsel wrote State Farm that Plaintiff's medical specials exceeded $22,473.05, that after fees and costs Plaintiff's recovery was "minimal" and requested that State Farm waive $10,000 in medical payments reimbursement. (Ex. F.) ¶8

59. Of the $150,000 global settlement, approximately $51,000 went to attorney's fees (about $18,000 to Firm 1 and $33,000 to Firm 2), plus additional amounts for costs and liens. Plaintiff's net recovery was approximately $86,000, barely exceeding her past medical expenses alone and leaving little to compensate for five years of pain, hiring help for necessary tasks, lost income and future care needs. (Ex. R.)

60. On November 16, 2023, Plaintiff executed the Release in favor of State Farm and others. The Release included a waiver of California Civil Code § 1542 and broad language purporting to extinguish all claims relating to the collision. Plaintiff signed while still confused about coverage, with questions unanswered, unsettled by attorney-lien pressure, and unaware of State Farm's internal liability assessments and regulatory issues. (Ex. R.) (Ex. E.)

61. Plaintiff seeks to rescind, avoid, or otherwise obtain relief from the Release as to Defendant State Farm to the extent it purports to bar Plaintiff's claims arising from Defendant's first-party policy obligations and claim handling, including the misconduct alleged in Counts 1–3 and Defendant's concealment

of material claim-file information prior to execution of the Release.

**H. Severe Emotional Distress and Suicide Planning**

62. Over years of claim-handling and litigation, Plaintiff's physical pain, cognitive limitations, and financial losses escalated. She lost clients, teaching work, and the ability to maintain the rural property and business she had built since 2010. State Farm cancelled Plaintiff's own auto policies twice despite a clean driving record, and for extended periods she had no effective representation while being required to appear alone at remote court hearings. (Ex. F.)

63. Under these pressures, Plaintiff experienced persistent suicidal ideation and, at one point, developed a concrete plan to end her life. She executed estate-planning documents and a power of attorney under which a friend and designated agent would inherit the house, land, horses, dogs, and move her business and animals to the property. Plaintiff's designated agent is prepared to testify regarding Plaintiff's mental state, suicide planning, and the seriousness of Plaintiff's expressed intent.

64. Plaintiff did not carry out her plan in part because winter weather and deep snow conditions made it physically impossible to bury herself as she believed necessary. Her suicidal ideation and intense distress persisted over months while State Farm continued to maintain a disputed liability narrative, delayed resolution, failed to clearly explain coverage, and allowed threatened cross-

claims and attorney-lien issues to hang over her. (Ex. M-CSI(CSI 000845).) (Ex. M-2.) (Ex. F.)

65. SPECT imaging and specialist evaluation in September 2024 confirmed traumatic brain injury, PTSD, insomnia, and upper-cervical syndrome, consistent with Plaintiff's reported emotional and physical suffering. (Ex. B.)

## I. Harm and Damages

66. Plaintiff's damages include actual economic losses and consequential harm arising from delayed and obstructed claim handling, including out-of-pocket costs, lost earning capacity, and associated emotional distress and functional impairment documented by later objective testing. (Ex. B.)

As a direct and proximate result of State Farm's conduct and the circumstances surrounding the Release, Plaintiff has suffered:

- Objective brain and upper and lower spinal injuries with ongoing pain and functional impairment;
- More than $50,000 in out-of-pocket medical, diagnostic, and travel expenses, in addition to amounts billed to insurance;
- Substantial lost income and business losses, including negative net income (e.g., approximately –$11,800 in 2024), loss of earning capacity, and inability to continue her prior work and horse-related business;
- Emotional distress, including depression, anxiety, PTSD symptoms, and suicidal ideation;
- Loss of enjoyment of life and ongoing risk to Plaintiff's ability to maintain her home, land, animals, and livelihood.

67. Certain documents substantiating these allegations are privileged and/or contain sensitive medical, financial, and personal identifiers; Plaintiff will produce such materials through discovery or under appropriate protective order, as required.

**J. Systemic Failure to Recognize and Treat TBI**

68. Despite multiple opportunities over a period of years, the medical providers, insurers, and attorneys involved repeatedly failed to recognize and treat Plaintiff's traumatic brain injury as such, minimizing it as a short-term "concussion" instead of a complex brain and upper cervical injury, and thereby depriving her of timely, appropriate care while her condition became chronic and disabling.

69. Defendant and its agents repeatedly relied on isolated "normal" findings—such as the absence of an emergency room visit, lack of an initial police report, normal structural scans, or cursory neurological exams—to imply that Plaintiff "must have been fine," ignoring well-established medical knowledge that traumatic brain injuries often present with normal imaging and that persistent symptoms must be taken seriously and correlated clinically rather than dismissed.

70. Plaintiff alleges that shock and survival behavior are not proof of "no injury," that loss of consciousness and confusion often go unrecognized, that "normal"

scans do not rule out TBI, that persistent pain and functional loss mean the problem is not resolved, and that brain, neck, and nervous system function must be viewed as one integrated injury.

71. Plaintiff has attached only selected exhibits at this pleading stage. Additional records supporting these allegations exist but are privileged and/or contain sensitive medical and financial information and personal identifiers; Plaintiff will preserve and produce such materials in discovery and, where necessary, seeks to do so under an appropriate protective order.

## IV. CLAIMS FOR RELIEF
## COUNT 1 — FRAUD IN THE INDUCEMENT / FRAUDULENT CONCEALMENT (Against State Farm Mutual Automobile Insurance Company)

72. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

73. This claim is brought under Montana law. Defendant, through its claims personnel (including State Farm Claim Specialist-Injury Peter Yang) and other agents acting within the course and scope of their roles, made misrepresentations of material fact and concealed material facts with the intent to induce Plaintiff, including through Plaintiff's representatives, to accept a compromised "global" settlement and to execute the on or about August 19, 2024 Release.

74. **Misrepresentation / concealment event #1** (comparative fault used to depress

value). On or about August 5, 2019, Defendant, through claim notes and/or communications attributed to State Farm Claim Specialist-Injury Peter Yang, recorded and maintained a 50/50 comparative-fault allocation for a rear-end collision despite information available to Defendant reflecting fault by the adverse driver. Defendant's recording and maintenance of this allocation misrepresented and/or implied that liability was materially disputed when Defendant's file contained information supporting a predominantly adverse-driver-fault conclusion. This allocation was material because it affected claim valuation, settlement posture, and UM/UIM evaluation. See Exs: (Ex. M-CSI (CSI 000521; CSI 000820; CSI 000835; CSI 000891).) (Ex. D.).)

75. **Misrepresentation / concealment event #2** (withholding damage photos/estimate). On March 3, 2020, Defendant, through State Farm Claim Specialist-Injury Peter Yang, sent a written communication to Plaintiff's counsel stating Defendant was "unable to disclose" the rental vehicle's photos and damage estimate because Plaintiff "is not the owner." This statement and/or the omission accompanying it was misleading because it positioned key collision-severity evidence as unavailable to Plaintiff while Defendant possessed and relied upon that evidence internally, and it hindered Plaintiff's ability to evaluate and prove the severity of impact and resulting injuries. (Ex. M-CSI (CSI 000753).)

76. **Misrepresentation / concealment event #3** (misleading liability posture despite file support). On March 1, 2023, Defendant's Cluster-3 claim specialist Peter Yang confirmed in writing that Defendant "will not accept the liability and will not put it in writing." (Ex. M-CSI (CSI 000194).) Defendant nevertheless continued to communicate and/or proceed under a comparative-fault posture while concealing internal file information undermining that posture, conveying that liability remained meaningfully uncertain when Defendant's file supported a stronger liability position favorable to Plaintiff. . (Ex. D) and related claim-file entries.

77. **Concealment event #4** (internal liability re-review not disclosed). Before Plaintiff executed the on or about August 19, 2024 Release, Defendant failed to disclose internal claim-file entries reflecting a liability re-review and fault allocation favorable to Plaintiff, including entries reflecting a 100%/0% allocation against the adverse driver in the UM/UIM context and supervisory commentary undermining the basis for a 50/50 allocation. For example, on February 23, 2023 at 4:01 PM CST, Defendant's injury claims supervisor Elena Jones documented that the handler changed liability from 100% to 50/50 because both claimant and named insured were insured by Defendant and that this "isn't how liability works." Defendant did not disclose this internal admission to Plaintiff prior to the Release. This concealment was material to

Plaintiff's settlement decision and to Plaintiff's ability to challenge the comparative-fault narrative. (Ex. M-CSI (CSI 000835.)

78. **Misrepresentation / concealment event #5** (coverage facts affecting settlement decision). Defendant, through its agent(s), misrepresented and/or failed to clearly communicate pertinent facts and policy provisions relating to the coverages at issue in a manner that was misleading to a reasonable insured. For example, after receiving State Farm correspondence regarding nonrenewal of her auto coverage. Plaintiff contacted State Farm and spoke with its representative. In a recorded telephone call on or about August 3, 2021 (Ex. I), Defendant's representative described Plaintiff's "$250,000/$500,000 liability" limits as amounts available for "the first person injured in an accident that's your fault … up to $500,000 depending on how many people there are," and described UM/UIM as "you're insuring yourself for $50–100,000," but did not clearly disclose to Plaintiff that the 250/500 limits being discussed were third-party bodily-injury liability limits and not benefits available to Plaintiff for Plaintiff's own injuries, and did not clearly explain that Plaintiff's first-party recovery for her own injuries would be governed by separate coverages and limits (including UM/UIM and Med-Pay). Plaintiff also made a written request to her State Farm agent/representative, Sandy Goode-Long, for clarification of her coverages; the request was forwarded to State Farm Claim Specialist-

Injury Peter Yang (the Cluster-3 injury handler) while Plaintiff was attempting to obtain a release from prior counsel, yet Plaintiff did not receive a clear explanation resolving her coverage confusion (Ex. I). These misrepresentations and omissions were material to Plaintiff's understanding of coverage, claim strategy, valuation, and decision whether to accept a compromised global settlement and execute a broad Release.

79. Defendant made the foregoing misrepresentations and omissions knowingly or with reckless disregard for their truth, and concealed material facts with the intent to induce reliance and to obtain Plaintiff's execution of a broad Release on compromised terms.

80. Plaintiff reasonably relied on Defendant's communications and omissions in the context of an insurer–insured relationship, including Plaintiff's lack of access to Defendant's internal claim file and Plaintiff's cognitive limitations and fatigue associated with traumatic brain injury. At the time Plaintiff sought coverage clarification from her State Farm agent/representative, Plaintiff was attempting to obtain a court order relieving prior counsel and lacked meaningful attorney assistance, as reflected in the agent's forwarding of Plaintiff's request to State Farm's claim specialist Peter Yang noting Plaintiff was going to court on February 16, 2023 to seek that relief. (Ex. I)

81. Plaintiff relied on the misrepresentations and concealments when she accepted

the purported global settlement and executed on or about August 19, 2024 Release. Had Plaintiff known the concealed internal liability conclusions and the true basis for the comparative-fault posture and coverage handling, Plaintiff would not have signed the Release, or would have demanded different terms and further investigation before compromising her rights. (Ex. R).

82. As a direct and proximate result of Defendant's fraud and concealment, Plaintiff suffered damages including economic and non-economic harms alleged above. Plaintiff seeks rescission/avoidance of the Release(s) to the extent available under governing law, restitution and/or contract and tort damages according to proof, and punitive damages to the extent permitted by law.

**COUNT 2 — STATUTORY UNFAIR PRACTICES (Mont. Code Ann. §§ 33-18-201, 33-18-242)** (Against State Farm Mutual Automobile Insurance Company)

83. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

84. Plaintiff brings this claim as an insured and first-party claimant under Mont. Code Ann. § 33-18-242. This count is brought under the statute and is not a common-law "bad faith" claim.

85. State Farm violated one or more actionable subsections of Mont. Code Ann. § 33-18-201 for which Mont. Code Ann. § 33-18-242(1) provides a private cause

of action, including:

a. § 33-18-201(1) — Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue.

b. § 33-18-201(4) — Refusing to pay claims without conducting a reasonable investigation based upon all available information.

c. § 33-18-201(6) and § 33-18-201(13) — Failing to attempt in good faith to effectuate prompt, fair, and equitable settlements and failing to promptly settle claims when liability is reasonably clear.

86. These violations include, among other things, (i) misrepresenting and/or failing to clearly communicate coverage and policy provisions relating to benefits decisions; (ii) maintaining and communicating an improper comparative-fault posture despite available information supporting adverse-driver fault; (iii) failing to conduct a reasonable investigation based upon all available information, including misstating Plaintiff's treatment history; and **(iv)** delaying fair and equitable resolution of Plaintiff's first-party claim when liability became reasonably clear, as reflected in Defendant's internal file conclusions and claim notes (Ex. I) (Ex. F) (Ex. D) (Ex. P.) (Exs. M-1–M-3) (Ex. M-CSI (CSI 000830, 000832, 000835, 000860, 000194).)

87. As a direct and proximate result of these statutory violations, Plaintiff suffered actual damages, including unpaid or underpaid benefits, out-of-pocket expenses, loss of income and earning capacity, and related harms. Plaintiff seeks all remedies available under Mont. Code Ann. § 33-18-242, including

attorney's fees and costs where authorized by law, and such other relief as permitted.

**COUNT 3 — BREACH OF INSURANCE CONTRACT** (Against State Farm Mutual Automobile Insurance Company)

88. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

89. Plaintiff's State Farm policy is a valid and enforceable insurance contract issued in Montana. Plaintiff performed all obligations required of her under the policy, including payment of premiums.

90. The policy obligated Defendant to provide Medical Payments ("Med-Pay") and Uninsured/Underinsured Motorist ("UM/UIM") benefits in accordance with its terms and applicable law, and to adjust and pay covered benefits as required by the contract.

91. Defendant's contractual duties included timely adjustment and payment of covered benefits and accurate communication regarding policy provisions affecting benefits decisions.

92. Defendant breached the contract by, among other things:

a. Failing to timely and fully pay medical expenses covered under the Med-Pay.; (Ex. M-1) (Ex. M-CSI (CSI 000830; CSI 000831).)

b. Failing to investigate, evaluate, and adjust Plaintiff's UM/UIM claim reasonably and in light of available information supporting the adverse

driver's fault;  (Ex M-1-M-3) (Ex. P) (Ex. M-CSI (CSI 000832; CSI 000835; CSI 000860).)

c. Failing to promptly tender UM/UIM benefits and/or policy limits after information available to Defendant supported Plaintiff's entitlement to such benefits under the policy. (Ex. P) (Ex. M-CSI (CSI 000832; CSI 000860).)

d. Misapplying, misstating, or failing to explain policy provisions affecting benefits decisions, such that Plaintiff did not receive the benefit of the coverage purchased. (Ex. I.)

93. These breaches are further reflected in Defendant's claim-file documentation showing administrative handling defects and lack of coordinated medical/benefits management. (Ex M-1.)

94. As a direct and proximate result, Plaintiff suffered contract damages including unpaid or underpaid benefits, consequential out-of-pocket costs, and related economic losses.

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant State Farm Mutual Automobile Insurance Company as follows:

- For rescission, avoidance, and/or other appropriate equitable relief concerning the Release(s) at issue, including a determination that any such Release is void, voidable, or unenforceable to the extent permitted by law;
- For general and special damages according to proof, including policy benefits due, medical expenses, out-of-pocket costs, lost income and loss of earning capacity, consequential damages, and emotional distress damages recoverable under governing law;

- For all remedies available under Mont. Code Ann. § 33-18-242, including actual damages, and attorney's fees and costs where authorized by law;

- For punitive damages, to the extent permitted by law;

- For pre-judgment and post-judgment interest as allowed by law;

- For costs of suit; and

- For such other and further relief as the Court deems just and proper.

DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.

Dated: February 11, 2026

*Nancy Louise Horne*

/s/ Nancy Louise Horne
Nancy Louise Horne, Pro Se
NANCY LOUISE HORNE
Plaintiff, Pro Se
555 Jackson Meadows Rd #94
Kila, MT 59920
Tel: 406-212-0267
Email: nancy@greatergoodranch.com